Catherine M. Muscarello, a Minor, by Joseph L. Muscarello, Her Father and Next Friend, Plaintiff-Appellant, v. Elaine Peterson, Defendant-Appellee.

Gen. No. 11,206.

Second District, Second Division.

February 8, 1960.

Released for publication February 25, 1960.

Lidschin and Pucin, of Waukegan, and Percival E. Thompson, of Chicago (Charles D. Snewind, of counsel) for plaintiff-appellant.

Snyder, Clarke, Dalziel, Holmquist, and Johnson, of Waukegan (William A. Holmquist, of counsel) for defendant-appellee.

PRESIDING JUSTICE SOLFISBURG delivered the opinion of the court.

This is an action for personal injuries sustained on June 5, 1955, by Catherine M. Muscarello, a six-year old child, when her father's automobile in which she was riding was struck at an intersection in Lake County, Illinois, by the automobile operated by the defendant, Elaine Peterson. The case was tried before a jury which returned a verdict for the plaintiff and against

the defendant in the sum of $2,000. Judgment was entered on the verdict, plaintiff filed her post-trial motion for a new trial, which was denied, and this appeal by plaintiff followed.

In her amended post-trial motion seeking a new trial and upon this appeal the plaintiff urges that reversible error was committed in the trial of this cause in at least three separate respects: (1) The damages awarded are inadequate and the verdict in that regard is, therefore, contrary to the manifest weight of the evidence; (2) the trial court committed prejudicial and reversible error in restricting plaintiff's cross-examination of Dr. H. R. Oberhill, defendant's medical witness, necessitating plaintiff calling the doctor as her own witness; (3) the furnishing by defendant to plaintiff's parents prior to trial of a copy of Dr. Oberhill's medical report, with a vital paragraph omitted therefrom, constituted a fraud upon the minor plaintiff and thereby prevented her from properly presenting her case and from receiving a fair trial.

Throughout this case it has been conceded by counsel for defendant-appellee, both before the trial judge and before this court, that there is no question on the issue of defendant's liability to plaintiff. The question seriously contested is concerned with the causal connection between the injury alleged to have been received by plaintiff on June 5, 1955, and her alleged condition of ill-being at the time of trial. It was the contention of plaintiff that she was a victim of Jacksonian epilepsy which was directly and proximately caused by the trauma sustained in the intersection collision in question. Defendant sought to prove that there was in fact no causal connection between the plaintiff's injury received in the collision and the seizures allegedly suffered commencing two months later and also that the nature and extent of plaintiff's condition of ill-being, including the matter of permanency,

was highly questionable. The case obviously hinged largely on the testimony of the medical witnesses.

The evidence was that following the collision the minor plaintiff complained of pains in her head and stomach, suffered a marked bruise on her forehead, and for a few days exhibited evidence of extreme nervousness. The extent of plaintiff's unconsciousness, if any, immediately after the cars collided is a matter of dispute, although plaintiff acknowledges that it was only "momentary" unconsciousness. The first seizure or convulsion which evidenced an epileptic condition appeared in mid-August following the occurrence. There was testimony that other seizures followed in rapid succession. The plaintiff was hospitalized in September, 1955, under the care of a Dr. Adelman, the family physician, who after observations and tests diagnosed the condition as "convulsions of post traumatic origin." At Dr. Adelman's suggestion, the plaintiff was referred to Dr. Frederick A. Gibbs, a professor of neurology and neuro-physiology, who practiced exclusively in the field of epilepsy and electroencephalography, for an electroencephalogram on September 12, 1955, which electroencephalogram was normal in all areas. On February 14, 1956, at the request of the insurance carrier for defendant, Dr. H. R. Oberhill, a physician and neurosurgeon, examined the plaintiff and thereafter Dr. Oberhill referred plaintiff to Dr. Gibbs for a second series of electroencephalograms. This second series made on February 24, 1956, showed spike seizure activity in the right mid-temporal area indicating abnormality in that region. On April 1, 1957, Dr. Gibbs re-examined plaintiff and made additional electroencephalograms at the request of Dr. Adelman, and these continued to show the same spike seizure discharges plus an additional abnormality elsewhere. Another series of electroencephalograms was taken in November, 1957, by Dr. Gibbs which revealed

266

essentially the same findings previously noted. Following his examination of plaintiff on February 14, 1956, at the request of defendant's insurer, Dr. Oberhill mailed a report of his examination to the insurance carrier, which read:

"February 18, 1956

"Universal Indemnity Insurance Co.
"Gentlemen:
"On February 14, 1956, I saw and examined seven-year-old Catherine Muscarello, a second grade student, whom you so kindly referred to us. We are informed that Catherine is the product of her mother's 5th pregnancy, there being two miscarriages, then two siblings now 23 and 13 years of age respectively, and finally Catherine herself. The gestation was probably not the full nine months and the mother feels that she probably delivered two weeks or more before term. Catherine weighed five pounds and six ounces at birth, pursued a normal neonstal course, and was taken home at the age of 12 days when her weight had reached a satisfactory level. According to the mother Catherine walked at approximately one year of age, talked 'quite young', and generally has been a healthy girl.

"On or about June 5, 1955, Catherine sat in the left rear seat of the family automobile when the car was involved in an accident with another vehicle causing her to be thrown to the floor and probably rendered unconscious for a matter of a few minutes. The parents themselves were dazed and when they recovered sufficiently looked to the back seat and found Catherine lying unresponsive on the floor. She soon recovered, screamed, and seemed to be quite hysterical. Catherine then complained of a discomfort in her

267

'side' and is said to have had a swelling on the left forehead. She was taken to the Sherman Hospital in Elgin, Illinois, and after some three hours observation was discharged to her home. As the parents were hospitalized Catherine stayed with her grandmother for a short period. She had nightmares, generally was quite nervous, complained of various aches and pains, but after a reasonable period, according to the mother she did 'pretty well.'

"She continued to do well until early in August, 1955 when while she was on a trip with her parents to North Dakota, and again sitting in the back seat of the car she gave a cry and the parents noted that she had suffered some sort of a 'spell'. She has had three spells in all. The first one was as related above, the second one some ten days after the first. With each episode she apparently had just fallen asleep, would suddenly sit up, cry, stare, and then began to have jerking movements of the left side of the face, neck and shoulder but nowhere else. The first two episodes lasted a matter of minutes. The last one was longer, lasting possibly as long as 45 minutes. After the third episode she was taken to the St. Theresa Hospital in Waukegan, Illinois, where she remained for six days. She was then sent by her family physician, Dr. Adelman, to Dr. F. A. Gibbs for an electroencephalogram, and later was seen by Dr. Harold Voorhees. I am of the impression that she saw Dr. Voorhees the latter part of September 1955.

"From the time of the first episode, presumably on Dr. Adelman's recommendation she had been taking dilantin and phenobarbital but the medication recently had been reduced by Dr. Voorhees so that she now takes dilantin and phenobarbital as follows: She is given a half pill

of dilantin four times a day and a half tablet of phenobarbital at bed time. I, of course, do not know what the doses might be. There have been no further spells but Mrs. Muscarello stated that Catherine is not doing as well in school as she had before.

"On occasion she might complain of headaches on coming home from school. Mrs. Muscarello impressed me as being a rather sincere woman and stated that Catherine had previously never had any seizures not even with high fevers as might be expected in childhood.

"On examination I saw an oriented, cooperative, rather quiet and rather chubby little girl of good intelligence. She spoke with no difficulty and in general was a most pleasant little girl. I was surprised at the extent of examination that we were able to carry out in one so young and am satisfied that our neurological examination was indeed most complete. The cranial nerve examination was absolutely within normal limits and so was the remainder of the neurological examination. The general physical examination, were it not for her chubbiness, was within normal limits also.

"X-rays were made of the skull at our request by Dr. Semmet and Dr. Baker and found to be within normal limits. These x-ray films are being forwarded to you under separate cover for your files.

"We have ordered an electroencephalogram to be made by Dr. F. A. Gibbs on February 24, 1956, and once we receive the results of that examination we will, of course, write you further.

"We are confronted here with a rather difficult problem as to cause and effect. We cannot deny that Catherine is suffering from a seeming convulsive state of a Jacksonian pattern, but what

269

the cause might be I cannot say. With the accident having occurred some two months previously and with her having suffered a head injury which caused her to be unconscious for a brief period I cannot see how the two can be separated. In general I would expect a much more serious 'head injury' with a long period of unconsciousness, before the usual '30%' pertains. It has been our experience that people suffering extensive head injuries with long periods of unconsciousness may in some 30% suffer convulsive seizures at a later date. Though this may be merely coincidental, and the child might possibly have suffered convulsive seizures even without the injury, I cannot honestly say that we can separate the accident and her seizures.

> "Sincerely yours,
> "s/H.R. Oberhill
> H.R. Oberhill, M.D."

A copy of this letter which omitted the last paragraph was sent to the parents of the plaintiff by an agent of the insurance company.

Dr. Oberhill was called as a witness by defendant and in answer to a hypothetical question stated that in his opinion, based solely upon the facts in the hypothetical question, the contusions or blow on the head described as occurring on June 5, 1955, was not connected with the plaintiff's condition of ill-being alleged to be existing at the time of trial. This opinion was based principally on two premises, first, that a trivial trauma with momentary or no unconsciousness would not ultimately result in seizures, and second, that electroencephalograms are a most unreliable test and grossly overrated. Dr. Oberhill conceded that the plaintiff was suffering from convulsions. Dr. Gibbs was called as a witness by the plaintiff, and the substance of his testimony in answer to a hypothetical

question was that the plaintiff's seizures might or could have been caused by the auto accident of June 5, 1955, based on the electroencephalographic studies and other information given. On cross-examination Dr. Gibbs acknowledged that only a small percentage of all blows to the head results in a post-traumatic epilepsy and that while electroencephalographic abnormalities indicate brain disturbances, the latter includes other disorders besides epilepsy. Dr. Adelman, the treating physician, testified that in his opinon the seizures or convulsions were the result of trauma sustained in this accident, and he stated that his opinion was based upon tests and examinations which he described. No useful purpose would be served by relating in detail the lengthy medical testimony.

Plaintiff's first contention is that the damages awarded her are so inadequate as to demonstrate prejudice against her or sympathy for the defendant or a gross misunderstanding of the evidence. She, however, acknowledges that there is a rational basis for the jury verdict here, namely a finding that her seizures or convulsions were not the result of this auto collision. After a careful study of the record, this court is drawn to the conclusion that the jury did so find, that the jury after weighing the conflicting medical testimony concluded that the blow or blows received in this accident did not cause plaintiff's seizures, and that, accordingly, the jury awarded plaintiff damages of $2,000 for her medical bills and pain and suffering arising out of the minor injuries admittedly sustained and which promptly appeared following the accident. Counsel for plaintiff contends that the jury's finding of no causal connection is contrary to the manifest weight of the evidence. Without embarking on a detailed discussion of the medical evidence presented, it must be observed that such evidence was in conflict and that the jury had a choice of inferences in reaching its ultimate conclusions as to the questions of

271

causal connection and the nature and extent of injury, including permanency. This court cannot substitute its findings for those of the jury where there is a conflict in the evidence and hold, as plaintiff urges, that Dr. Oberhill's testimony is so lacking in probative value that it must be disregarded and that therefore the verdict is against the manifest weight of the evidence. It was solely within the province of the jury to ascertain from among all the medical testimony presented the facts on the issues of causal relationship and the nature and extent of injury. The credibility of witnesses, the weight of the evidence, and the inferences to be drawn from facts proved are all questions for the jury to pass upon and not for this court to decide, Molloy v. Chicago Rapid Transit Co., 335 Ill. 164. The record fails to indicate that this verdict was not the result of the impartial and honest judgment of the jury, Joseph Taylor Coal Co. v. Dawes, 122 Ill. App. 389, or that it was clearly and palpably erroneous, Meyer v. Williams, 15 Ill.App.2d 513.

Plaintiff next contends that the trial court committed reversible error in restricting plaintiff's cross-examination of Dr. Oberhill and making it necessary for plaintiff to call the doctor as her own witness. In his brief and argument counsel for plaintiff states that he was prevented by the trial court from showing inconsistencies between the letter from Dr. Oberhill to Universal Indemnity Insurance Co., dated February 18, 1956, and the doctor's testimony on direct examination. However, this was not the fact. When Dr. Oberhill was examined, counsel for plaintiff had an opportunity to examine the copy of the original letter and to cross-examine the doctor upon any statements made by him in the letter at variance with his testimony on the witness stand. Nevertheless, counsel for plaintiff did not attempt to cross-examine the doctor upon the opinion expressed in his

272

letter to the effect that he could not separate the accident and plaintiff's seizures.

Dr. Oberhill's testimony on direct examination was confined to a hypothetical question. Plaintiff's attorney on cross-examination elicited from Dr. Oberhill the fact that he had at one time examined the plaintiff and then counsel sought to elicit from the doctor the fact that he had ordered electroencephalogram studies of the plaintiff. When objection to this line of questioning was made by defendant's counsel and sustained by the court, counsel for plaintiff explained in chambers he proposed to discredit Dr. Oberhill's direct testimony as to the value of electroencephalograms by showing that he himself ordered an electroencephalographic examination of the plaintiff. The trial court refused to permit this line of cross-examination on the ground that the direct examination had been limited to the hypothetical question in which no reference was made to Dr. Oberhill's examination of the plaintiff.

■■■■ The general rule, followed in Illinois, is that the scope of cross-examination rests largely within the discretion of the trial court, the exercise of which will not be reviewed in the absence of an abuse thereof, McCray v. Illinois Cent. R. Co., 12 Ill.App.2d 425. Here counsel sought to question Dr. Oberhill concerning his examination of plaintiff on a prior occasion and thereby were attempting to go beyond the direct examination. Under these circumstances, we cannot hold that the court below committed an abuse of discretion in so limiting cross-examination. Moreover, plaintiff has failed to demonstrate, and we fail to perceive, wherein she was prejudiced by this ruling, for she was later able to elicit the desired information from the doctor on direct examination.

Plaintiff's third and final point is that the false report submitted to the plaintiff's parents constituted

273

a fraud upon the minor plaintiff, her parents, her attorneys, and the court, and thereby prevented her from properly presenting her case to the jury and obtaining a fair trial. Dr. Oberhill's report or letter to defendant's insurer was, when furnished to plaintiff's parents by the insurance company, altered to the extent that the very significant final paragraph was entirely omitted. This examination and report by a doctor selected and requested by defendant occurred prior to the adoption of Supreme Court Rule 17—1 (Ill. Rev. Stats., Ch. 110, Section 101.17—1), which provides for such physical examination and the furnishing to the opposite party a duplicate original of the doctor's report. Supreme Court Rule 17—1 would today bar defendant from calling Dr. Oberhill as a witness at the trial under these circumstances. It requires considerable judicial restraint in discussing this reprehensible conduct of which someone on behalf of the defendant was guilty. The record reveals that this cruel deception was brought to the attention of counsel for plaintiff upon the trial of the cause during the examination of Dr. Oberhill.

While we deplore this conduct on the part of defendant's insurance carrier, we agree with the ruling of the trial judge that this improper conduct cannot serve as grounds for a new trial under the factual situation in this record. The alteration of the doctor's report was made known to the plaintiff and her counsel during the examination of Dr. Oberhill. Unquestionably, plaintiff had the right not only to vigorously cross-examine the doctor on the substantial contradiction between his report and his court room testimony but also to argue this matter to the jury. The fact is, this was not done. Although plaintiff's counsel requested the copy of the original letter placed in the record, they did not request its admission for purposes of having the jury read it nor did they interrogate the doctor either on cross-examination or on

274

direct examination as plaintiff's witness regarding any conflict in the views expressed by the doctor. It was in plaintiff's Amendment to her Motion for New Trial that she first raised this ground for new trial based upon the inconsistency of the omitted paragraph and the doctor's court room testimony. Since counsel had available to them at the trial all these facts, the trial court was justified in denying plaintiff's motion for new trial.

For the reasons advanced hereinabove, the judgment of the Circuit Court of Lake County is affirmed.

Affirmed.

CROW and WRIGHT, JJ., concur.